UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

ARISTEDE F. BURD　　　　　　　　　　　CIVIL ACTION NO. 09-cv-0969

VERSUS　　　　　　　　　　　　　　　　JUDGE STAGG

WARDEN, LOUISIANA STATE　　　　　　MAGISTRATE JUDGE HORNSBY
PENITENTIARY

## REPORT AND RECOMMENDATION

**Introduction**

A Caddo Parish jury convicted Aristede Francois Burd ("Petitioner") of aggravated rape, and he was sentenced to life imprisonment. He pursued a number of issues on direct appeal, State v. Burd, 921 So.2d 219 (La. App. 2d Cir. 2006), writ denied 941 So.2d 35 (La.), and in a post-conviction application. He now seeks federal habeas corpus relief on several of those grounds. For the reasons that follow, it is recommended that his petition be denied.

**Sufficiency of the Evidence**

Petitioner was convicted of aggravated rape, which La. R.S. 14:42(A) defined as a rape committed where the sexual intercourse is deemed to be without lawful consent of the victim because it is committed under certain circumstances, including when the victim is prevented from resisting because the offender is armed with a dangerous weapon, when the victim resists to the utmost but her resistance is overcome by force, or the victim is prevented from resisting by threats of immediate bodily harm accompanied by apparent power of execution. The prosecution's theory was that Petitioner committed the rape while armed

with a knife, which he actually used to cut the victim when she resisted. Petitioner's defense was that the encounter was consensual.

The victim, AT, testified that in February 2003, she was 7.5 months pregnant and living alone in an apartment north of downtown Shreveport. She had been working in housekeeping at Boomtown Casino, but she had to stop when there was no light duty available to accommodate her health status. She did not have a car or roommate and was not in a relationship, but she had family and friends who would give her rides. A neighbor gave her a ride around 11:00 p.m. to the Hollywood Casino in downtown Shreveport. AT planned to take a cab home, but she lost all of her money after playing blackjack for a few hours.

AT testified that she did not want to bother her family by calling them for a ride late at night, so she started walking toward home (which a map shows was about 2.4 miles distant). She made it only a short distance from the casino when a man driving an SUV stopped beside her and offered her a ride. That man was Petitioner. According to AT, he said that a pretty young woman like her did not need to be walking, and he encouraged her to get in by saying that he would not do anything but take her home. AT got in.

During the drive, the man asked AT about whether she was in a relationship. He said that his name was Charles and that he was 25, but AT challenged that assertion, and he admitted to being closer to 35. He told AT that he wanted her to go with him to pick up someone else, but she said no. He was insistent, and AT at one point opened the door when stopped at a red light. She said she would get out right then if he was not going to take her home. He then drove directly to her apartment building, which she found strange since there

were three other apartments in the area and she had not yet said where she lived. When AT asked Petitioner about this, he said he had a friend who lived there.

Even after they arrived, Petitioner kept insisting that AT go somewhere else with him. She noted that he appeared nervous and was sweating and fidgeting. He also began asking her if she wanted to "be with him in the car and stuff like that." AT said she had to go, but she had trouble opening the door. Petitioner came around, opened the door, and pulled out a kitchen knife with a black handle. He told her to get out, and he held the knife on her stomach. AT falsely told him that her sister was in her apartment, but Petitioner said he did not care and would do the same thing to the sister as he was going to do to AT. Petitioner said he would kill AT and her baby if she did not go up to the apartment.

When they got to the apartment, Petitioner searched it. AT claimed that her "sister" must be next door. Petitioner ordered AT to take her clothes off, and she did. He then started kissing her all over her body, pushed her down on the bed, pulled his pants down slightly and raped her. He also performed oral sex on her, during which she tried to get away, but Petitioner would tell her to shut up or he would kill her and her baby. He would hold the knife in different places so that she was often unsure where he had it, whether in his hand or under the mattress. AT was able to avoid Petitioner's attempts to perform other oral and anal sex activities.

AT told Petitioner that her stomach was hurting and that she needed help. Petitioner said she was lying, and he checked her to see if she was bleeding. She also asked to call 911, but he refused. When it appeared Petitioner was going to attempt to rape her again, AT

were three other apartments in the area and she had not yet said where she lived. When AT asked Petitioner about this, he said he had a friend who lived there.

Even after they arrived, Petitioner kept insisting that AT go somewhere else with him. She noted that he appeared nervous and was sweating and fidgeting. He also began asking her if she wanted to "be with him in the car and stuff like that." AT said she had to go, but she had trouble opening the door. Petitioner came around, opened the door, and pulled out a kitchen knife with a black handle. He told her to get out, and he held the knife on her stomach. AT falsely told him that her sister was in her apartment, but Petitioner said he did not care and would do the same thing to the sister as he was going to do to AT. Petitioner said he would kill AT and her baby if she did not go up to the apartment.

When they got to the apartment, Petitioner searched it. AT claimed that her "sister" must be next door. Petitioner ordered AT to take her clothes off, and she did. He then started kissing her all over her body, pushed her down on the bed, pulled his pants down slightly and raped her. He also performed oral sex on her, during which she tried to get away, but Petitioner would tell her to shut up or he would kill her and her baby. He would hold the knife in different places so that she was often unsure where he had it, whether in his hand or under the mattress. AT was able to avoid Petitioner's attempts to perform other oral and anal sex activities.

AT told Petitioner that her stomach was hurting and that she needed help. Petitioner said she was lying, and he checked her to see if she was bleeding. She also asked to call 911, but he refused. When it appeared Petitioner was going to attempt to rape her again, AT

grabbed his penis forcefully with one hand and the knife with her other. Petitioner was able to get the knife back from her, but she nonetheless continued "steady squeezing" his penis and trying to force him out the door. She let go at one point and grabbed a phone, which he knocked out of her hand. He then tried to pin her down, but she fought back, trying to block his knife, and suffered a cut on her right hand. Petitioner seemed startled by the blood, and told AT to rinse it with cold water. He began talking about marrying her and saying that he had done this type of thing before, but she was one of the craziest people that he had done it to.

Petitioner said he did not want to leave because he knew AT would call the police. She assured him that she would not, and he eventually left. AT saw him run out of her apartment, and she grabbed a pen and paper and attempted to get downstairs quick enough to write down the license plate number, but Petitioner was driving away, like he really was not in a hurry, by the time she got there. She ran to the security guard area, but the guard was not there, so she went to a pay phone and dialed 911.

The Shreveport police, aided with AT's description of the vehicle (including damage to it, a crocheted white cross hanging inside, and religious books on the backseat) and Petitioner's comment to her that he lived near the LSU Medical Center, located Petitioner's SUV at an apartment complex near the hospital. AT identified Petitioner in a photo lineup (and again at trial). Officers searched Petitioner's apartment and found items including tennis shoes stained with blood and kitchen knives with black handles. No knife was found

in AT's apartment, but officers did observe blood and bodily fluids on the sheets and mattresses.

Detective Kim Rei of the sex crimes unit testified that she took a recorded statement from Petitioner about two days after the incident. The recording was played for the jury, but the court reporter did not transcribe what was said. The Bates stamp on the record supplied to the court is too faint to read, but this occurred during the testimony of Detective Rei that is in Volume 5, page 90 under the state court numbering. The State's brief does not cite to a copy of a transcript of the statement, and the court has not encountered one in the voluminous record. As is usually the case, the record supplied to this court does not include the trial exhibits, such as weapons, drugs, or audio recordings of statements played to the jury. It would be a good practice for prosecutors to make an exception to that with respect to confessions or statements that are a significant part of the trial evidence. They should submit either a transcription (preferable) or a copy of the audio recording. These proceedings do not have to be delayed to obtain that information because, fortunately, Detective Rei summarized the statement in her testimony. The state appellate court also recited the contents of the statement, and Petitioner has not objected to any of the alleged contents of his statement.

Petitioner told police that he did pick up AT and give her a ride to her apartment, where he claimed that they had consensual sex. His explanation for the cut on AT's hand was that, afterward, she became depressed about losing $300 at the casino and having to take care of her sister (who AT testified was fictitious) and a new baby. Petitioner said AT got

the knife, he tried to take it away from her, and that is when she got cut. He said that he stayed a while after that. When he left, he said that he might be back. Petitioner speculated that it might have been because he did not return that AT decided to complain of rape.

Officer Pell took AT's statement. She was crying and very shaken up, so that she had trouble talking. Pell said that AT was telling things out of order because she wasn't thinking clearly, given the setting. Her statement was, however, largely consistent with her testimony. There were some minor differences, such as stating that she was leaving the casino at 11:00 p.m., when she testified that she arrived at about that time. Dr. Tracy Behm examined AT after the crime. She testified as to how AT described the assault during the examination, and that description was also very consistent with AT's trial testimony.

In evaluating the sufficiency of evidence to support a conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 99 S.Ct. 2781, 2789 (1979). "[I]t is the responsibility of the jury – not the court – to decide what conclusions should be drawn from evidence admitted at trial." Cavazos v. Smith, 132 S.Ct. 2, 4 (2011).

The state appellate court conducted a thorough review of the trial evidence and analyzed Petitioner's challenge to the sufficiency of the evidence under the Jackson standard. It noted that the primary issue was whether the intercourse was without the victim's consent. Petitioner attempted to portray his version of the events as more persuasive by pointing out certain discrepancies in the details of AT's statements such as the time of certain events.

Petitioner also noted that he did not prevent AT from washing the cut on her hand, and he stayed for a time after the injury. He also said that AT's clothes were found folded in a clothes hamper, which was more consistent with a consensual encounter. (The crime scene officer testified that the clothes the victim said she was wearing were "in a hamper by the bed", but he did not say they were folded. Tr. 921, 923.) Petitioner also challenged as incredible AT's assertion that she, seven months pregnant, was walking at night in February. (Petitioner perhaps forgot that he gave a statement and admitted that he picked up AT while she was walking outside that night.)

The state appellate court reasoned that Petitioner's arguments went to credibility, which was for the jury to decide, and the jury could quite easily have rejected Petitioner's "incredible story" and accepted AT's account and the corroborating evidence. Her version of the events was more than adequate to establish the elements of aggravated rape. State v. Burd, 921 So.2d at 222-23.

Habeas corpus relief is available with respect to a claim that was adjudicated on the merits in the state court only if the adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d). A state-court decision rejecting a Jackson sufficiency challenge is reviewed under a doubly deferential standard. It may not be overturned on

federal habeas unless the decision was an objectively unreasonable application of the deferential Jackson standard. Parker v. Matthews,132 S.Ct. 2148, 2152 (2012).

If the jury accepted as credible AT and the other prosecution witnesses, then it was rational to conclude that there was no reasonable doubt as to Petitioner's guilt. Such credibility determinations are squarely within the province of the trier of fact and, "under Jackson, the assessment of the credibility of the witnesses is generally beyond the scope of review." Schlup v. Delo, 115 S.Ct. 851, 868 (1995). Petitioner has not come close to satisfying his heavy burden. This case presented a classic question of credibility. The jury made a rational decision, and the state court's assessment of that verdict for the sufficiency of the evidence cannot be described as an objectively unreasonable application of Jackson. Habeas relief is not allowed on this claim.

**Other Crimes Evidence**

Louisiana Code of Evidence Article 412.2 provides that when an accused is charged with a crime involving sexually assaultive behavior, evidence of the accused's commission of another crime involving such behavior may be admissible and considered for its bearing on any matter to which it is relevant, subject to the balancing test in Article 403. The prosecutor gave notice of intent to introduce such evidence, and the state court held a hearing regarding admissibility. The evidence was allowed.

KH, age 19, testified at trial that she was attacked by Petitioner soon after she turned 14. She had delivered some seizure medication to her aunt's house and missed her bus home. She began to walk down the street to another bus stop and was between Jordan Street and

Louisiana Avenue when a man grabbed her by the hair and dragged her to his car. He drove her to a deserted area near Stonewall, raped her, and returned to Shreveport. He forced her into an apartment on Egan Street and raped her again. He used a knife to threaten the girl throughout these events. When he tried to force oral sex on her at the apartment, she began to fistfight with him. He put the knife to her neck and scratched her. He eventually allowed the girl to leave. He gave her some money, told her to keep her mouth shut, and said that if she was pregnant he would take care of her and the child. The witness was confident that Petitioner was the man who committed these acts. After an investigation of this crime against KH, Petitioner pleaded guilty to carnal knowledge of a juvenile.

Petitioner argued on direct appeal that the trial court erred in allowing this other crimes evidence. The argument was based on state-law evidence rules and related caselaw, with only a generic reference to unspecified "Constitutional protections." Tr. 1193-97. The same is true of the application for writs filed with the Supreme Court of Louisiana. Tr. 1265-68.

Habeas relief is not available with respect to mere errors of state law, such as a mistake in the application of evidence rules. Wheeler v. Thaler, 347 Fed.Appx. 981, 982 (5th Cir. 2009). The State argues that Petitioner did not properly exhaust, as required by 28 U.S.C. § 2254(b)(1)(A), any federal claim by presenting this evidence argument to the state court. Proper exhaustion requires that the claim be presented to the state court within a federal constitutional framework. Scott v. Hubert, 635 F.3d 659, 667 (5th Cir 2011), citing Baldwin v. Reese, 124 S.Ct. 1347 (2004) (claim in state court petition for ineffective

assistance of appellate counsel not exhausted because not identified as federal in nature). The determination of whether the claim was presented in such a fashion is made by looking to the briefs filed in state court. Smith v. Digmon, 98 S.Ct. 597 (1978); Soffar v. Dretke, 368 F.3d 441, 467 (5th Cir. 2004). Petitioner, by confining his argument to whether the state courts properly applied the state evidentiary rules and balancing tests, did not properly exhaust a federal claim in connection with this issue. Similar habeas claims based on appeals of evidentiary rulings and Prieur or "other crimes" evidence claims are often denied for this reason. See e.g. Wheeler, 347 Fed.Appx. at 982 (challenge to admissibility of evidence that accused molester molested another victim); Beck v. Cain, 2011 WL 3269646, *5 (E.D. La. 2011).

Even if it is assumed that Petitioner did exhaust a federal claim, relief is difficult to obtain. The Due Process Clause provides a mechanism for relief when a state court wrongfully admits evidence, but only if the evidence is so unduly prejudicial that it renders the trial fundamentally unfair. Bigby v. Cockrell, 340 F.3d 259, 271-72 (5th Cir. 2003). The admission of an extraneous offense does not violate due process if the State "makes a strong showing that the defendant committed the offense and if the extraneous offense is rationally connected with the offense charged." Wheeler, 347 Fed.Appx. at 982, quoting Wood v. Quarterman, 503 F.3d 408, 414 (5th Cir. 2007).

The state court reasoned that the evidence was properly admitted because of the similarities between the two crimes. Burd, 921 So.2d at 224. There were similarities in that a knife was used, similar sex acts were engaged in, and Petitioner both times acted as if he

might be in some form of relationship with the victim. The other crime evidence tended to undermine Petitioner's claim that his encounter with AT was consensual. Petitioner has not shown that the evidence was wrongfully admitted under state law, and the earlier crime was certainly rationally connected to the crime against AT. Accordingly, habeas relief is not permitted.

**Knives**

Police seized some kitchen knives during the search of Petitioner's home, and they were offered into evidence over Petitioner's objection. AT was shown four knives. She testified that some of them were similar but not identical to the knife Petitioner used. Petitioner argued on direct appeal that the knives were erroneously admitted. The argument to the appellate court and Supreme Court of Louisiana was posed solely in terms of state law. Tr. 1198-99, 1269-70. The state appellate court found that admission of the knives was erroneous because the State did not prove that they were used in the crime. The error was, however, deemed harmless because the State did not refer to the knives during the closing arguments, the evidence of guilt was overwhelming, and Petitioner admitted that a knife was involved in the incident. Heard, 921 So.2d at 224-6.

Petitioner's argument to this court is once again couched only in terms of state law, such as the application of L.C.E. art. 402 and jurisprudence that has interpreted it. That appellate issue did not, for the reasons given above with respect to the other crimes evidence, exhaust a federal constitutional claim that is cognizable on habeas review. Furthermore, the admission of the knives was not so prejudicial as to render the trial fundamentally unfair.

The victim testified that the knives presented to her were not used in the crime, so their admission was of minimal impact. There is certainly no reason to believe the admission of the knives had a substantial influence on the jury's verdict.

**Appellate Record**

Petitioner was appointed counsel for direct appeal, and counsel filed a brief. Petitioner moved to obtain a copy of the appellate record so that he could prepare a pro se supplemental brief. The appellate court granted the request and directed the Clerk of Court to provide the records custodian at the prison facility a copy of the record, redacted in accordance with a state statute that prohibits the disclosure of the name, address, or identity of victims of sexual offenses. La. R.S. 46:1844(W). The Clerk of Court did as directed, with a cover letter to an official at the state penitentiary that asked Petitioner be allowed to "view this record under strict supervision" and that the prison then return the record to the Clerk.

Petitioner complained in his post-conviction application that this denied him rights related to access to the courts and appeal. The trial court wrote that it was the appellate court's decision at issue, so Petitioner would have to address the issue to that court. Tr. 1361. Petitioner applied for a supervisory writ on this and other issues. The appellate court did not specifically address this issue. It wrote in a brief opinion that the "writ record reveals that the applicant has failed to meet his burden of proving that relief should be granted" and that the trial court did not err in denying the applicant's claims. Tr. 1537. The Supreme Court of Louisiana denied writs without comment.

Petitioner complains that he was allowed to review the record while locked in a room with it and forbidden to do anything but read it and make notations on a legal pad.  Exhibit F to his petition is a memo that states Petitioner was allowed, between November 29 and December 16, to come to the main office after the 4:00 p.m. count, check out the transcript, and review it in a holding pen until 9:00 p.m.  No other inmates were allowed to be in the area. Petitioner could not copy any pages, but he could read the record and take all the notes he wanted.

Petitioner complains that this constituted a wholesale denial of his right to appellate review, but both he and his appointed counsel managed to file appellate briefs.  Petitioner does not point to a single issue that he could have raised had only he been allowed to review the transcript in some other part of the prison. And Petitioner has not articulated how the state court's action violated any federal law that was clearly established by the Supreme Court, as required by 28 U.S.C. § 2254(d).  Furthermore, Petitioner had appointed appellate counsel, which satisfied his right to counsel and to access the courts.  See Naquin v. Orleans Parish Sheriff's Office, 2012 WL 262988,  *4 (E.D. La. 2012) (collecting cases where appointed counsel satisfied right of access to courts).

**Ineffective Assistance of Counsel**

Petitioner's fifth claim, according to its heading, is that counsel was ineffective for failing to investigate defense evidence/theories and for allowing prejudicial "bolstering" of the State's case.  The text of the argument never refers to this alleged bolstering.  Rather, it faults counsel for not having an expert, not obtaining phone records, and not securing a

psychological history of the victim. The remainder of the argument points to additional quibbles with the evidence in an attempt to undermine the credibility of AT.

The state trial court rejected the expert claim because Petitioner did not state what type of expert should have been called or what testimony he could have offered to change the verdict. As for the phone records, Petitioner argued that counsel should have obtained records that would show Petitioner called his friend from his mother's house about giving the friend a ride home after work. Petitioner says he called the friend again after he left AT's apartment, but the friend no longer needed a ride. The state court pointed out that Petitioner did not testify to these facts (which would be of minimal if any help to the defense), and the phone records could show only that someone made calls from Petitioner's mother's house to the friend at certain times. They would not show who was on the line or what they said. The state court rejected the psychological history argument, reasoning that Petitioner presented no evidence to raise any concerns that the accusing witness had psychological issues. Tr. 1360-62. This decision, as the last reasoned decision by a state court, controls for habeas purposes. Chester v. Thaler, 666 F.3d 340, 357 (5th Cir. 2011).

To prevail on a claim of ineffective assistance of counsel, a petitioner must establish both that his counsel's performance fell below an objective standard of reasonableness and that, had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984).

Petitioner's claim was adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state

court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold. Schriro v. Landrigan, 127 S.Ct. 1933, 1939 ( 2007). And the Strickland standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it. The federal court's review is thus "doubly deferential." Knowles v. Mirzayance,129 S.Ct. 1411, 1420 (2009).

"If this standard is difficult to meet, that is because it was meant to be." Harrington v. Richter, 131 S.Ct. 770, 786 (2011). Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system. Id. Thus, "even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id.

Petitioner has not offered any new arguments since he presented these claims to the trial court. They are nothing more than conclusory assertions with no supporting evidentiary basis in the record. The state court's rejection of these claims was anything but an objectively unreasonable application of Strickland, so habeas relief is not permitted.

**No Challenge to Article 412.2**

The State filed a pretrial notice that it intended to introduce evidence of other crimes pursuant to Article 412.2. The notice listed five female victims and attached reports of related criminal investigations or proceedings. One of those victims testified at trial. Petitioner argued in his post-conviction application that his trial and appellate counsel were ineffective

because they failed to argue that Article 412.2 is unconstitutional and was unconstitutionally misused at trial.

The trial court reasoned that La. C. Cr. P. art. 841(A) required a pretrial motion to preserve the constitutional challenge. The entire claim was denied based on this procedural issue. Tr. 1363. The substance of Petitioner's argument, however, is not so much a facial challenge to the constitutionality of the article but an assertion that counsel was ineffective for not objecting to the unconstitutional admission of the other crimes evidence. The procedural rule invoked by the state court is inapplicable to that Strickland claim, and the state court's failure to address the claim on the merits means that this court's review is de novo. Saltz v. Epps, 676 F.3d 468 n. 46 (5th Cir. 2012); Powell v. Quarterman, 536 F.3d 325, 343 (5th Cir. 2008).

The conviction in the earlier case was for carnal knowledge of a juvenile. Petitioner contends that he was never charged with anything other than having consensual sex with the juvenile, and he represents: "The state said in its opening statement that this 'encounter' with KH was consensual sex." He contends that counsel, thus, should have strenuously objected to KH's testimony that suggested a more serious aggravated rape. A review of the State's opening statement reveals, however, that the prosecutor described the earlier event as an encounter where the juvenile victim was forcefully put in a vehicle, driven away, raped twice, taken back to Petitioner's apartment and raped twice again. The only mention of consensual sex was when the prosecutor said Petitioner claimed during the investigation that it had been a consensual encounter with the 14 year old, just as he claimed in this case. The prosecutor

Page 16 of 18

said that because of the conflicting evidence in that case Petitioner faced a lesser charge, carnal knowledge of a juvenile, "and that's consensual sex with a minor." Tr. 809-10. Accordingly, Petitioner's description of the record is inaccurate. The testimony from the juvenile's non-consensual encounter was well known from both the pretrial notice and within the scope of the opening statement.

Trial counsel might not have properly objected to the admission of this evidence, but appellate counsel did. The appellate court noted that the issue had not been properly preserved for appeal, but it went on to address the merits of the objection and found the evidence of the prior crime admissible because of the similarities of the crimes. Accordingly, there is not a reasonable probability that had trial counsel objected the result in the case would have been different. The almost certain result is that the trial court would have overruled the objection and admitted the evidence, and that decision would have been affirmed on appeal. Habeas relief is not permitted on this final claim.

Accordingly,

**IT IS RECOMMENDED** that the petition for writ of habeas corpus be denied.

### Objections

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b). A party may respond to another party's objections within seven (7) days after being served with a copy thereof. Counsel are

directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court. See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b). Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of the denial of a constitutional right. Section 2253(c)(2). A party may, within **fourteen (14) days** from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 17th day of July, 2012.

                                              MARK L. HORNSBY
                                          UNITED STATES MAGISTRATE JUDGE